UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS MCCOOL, BRIAN MCCOOL, and MEGHAN MCCOOL,<br><br>Plaintiffs,<br><br>v.<br><br>PHILLIPS ACADEMY, TRUSTEES OF PHILLIPS ACADEMY, and SUSAN ESTY,<br><br>Defendants. | * * * * * * * * * * * * * * | Civil Action No. 25-cv-12109-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

In this action, Plaintiff Thomas McCool ("Tommy"), along with his parents Brian and Meghan McCool (collectively, "Plaintiffs"), have brought claims against Defendants Phillips Academy, Trustees of Phillips Academy (together with Phillips Academy, "Andover"), and Susan Esty ("Esty") (collectively, "Defendants"), arising out of Tommy's experiences while he was a student at Phillips Academy Andover, a private secondary boarding school in Andover, Massachusetts. Currently before the Court is Defendants' Motion to Dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 12]. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**, as set forth below.

## I. BACKGROUND

### A. Factual Background

The following facts are drawn from Plaintiffs' complaint, [ECF No. 1 ("Compl.")], and from undisputedly authentic documents "that are central to [Plaintiff's] claim or sufficiently referred to in the complaint." Crawford v. Salve Regina Univ., 178 F.4th 734, 742 (1st Cir.

2026) (quoting Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 717 (1st Cir. 2014)). For purposes of this motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

Tommy was a high school student at Philips Academy Andover from 2019 to 2024. [Compl. ¶ 12]. During the relevant times, Tommy, whose parents lived in California, resided at Andover's campus in Massachusetts as a boarding student. [Id. at 2]. In 2022, Andover placed Tommy on an Individualized Education Plan ("IEP") as an accommodation for an unspecified disability. [Id. ¶¶ 14–15]. Tommy's IEP entitled him to "extended time on class-graded assignments and timed writing, access to audiobooks, preferential seating, and note-taking assistance." [Id. ¶ 16].

Sometime in early 2023, a student-run "secret society" known as "Truth, Unity, and Brotherhood" or "TUBs" "publicly re-emerged on campus." [Compl. at 1]; [id. ¶¶ 19–21]. Plaintiffs allege that secret societies such as TUBs are banned at Andover, [id. ¶ 19], but that they have long existed on its campus, [id.], that their existence has been "frequently document[ed] . . . over the years," [id.], and that they have "operated with tacit institutional tolerance," [id. at 1]. Tommy became a member of TUBs after a then-current member sent him a "coercive and threatening message," [id.], instructing him to go to a graveyard after dark, where Tommy was "coerced and intimidated" into participating in an initiation ritual. [Id. ¶¶ 20–22, 33]. As part of that ritual, TUBs members blindfolded Tommy, forced him into the trunk of a car, repeatedly struck him, pushed him to the ground, waterboarded him, and urinated on him. [Id. ¶¶ 24–31].

Slightly over one year later, in May of 2024, TUBs tasked Tommy with recruiting new members. [Compl. ¶ 34]. Tommy complied, working to recruit two new students but refraining from engaging in any of the coercive, harmful, or unlawful initiation conduct he had experienced the year before. [Id. ¶¶ 35–39]. Specifically, Plaintiffs allege that Tommy "told the two students they were not obligated to join the group," [id. ¶ 37], "promised not to place them in danger if they chose to participate," [id.], offered the new recruits a "loyalty task" that did not involve any rule-breaking, [id. ¶ 38], avoided "ever touch[ing], threaten[ing], or pressur[ing] the boys," [id. ¶ 39], and "repeatedly assured them they could opt out at any time," [id.].

On May 13, 2024, shortly after he participated in recruiting new members to TUBs, Tommy was informed by a school administrator that he was being accused of "hazing, participation in a secret society, and theft." [Compl. ¶ 40]. Tommy was told to report to a building on campus known as the Sykes Wellness Center, where he was confined in a room by himself for at least 18 hours. [Id. ¶¶ 42, 139]. During his confinement, Andover took Tommy's possessions, including his electronics, [id. ¶¶ 41, 43], provided him with only a blanket and a pencil and paper, [id. ¶ 43], and forced him to go without food for an "extended period," after which he was provided only a sandwich to eat, [id. ¶ 43]. Throughout this period, Tommy was unable to communicate with anyone outside the Sykes Wellness Center, including his parents, [id. ¶¶ 42, 45–46], and he was forbidden from accessing his course materials and school computer, despite it being finals week, [id. ¶ 44]. After Andover sent Tommy's parents an email informing them of his whereabouts, they were unable to reach him through the school, leading them to contact the Andover Police to request a wellness check. [Id. ¶¶ 45–47].

The same day that Tommy was confined, Defendant Susan Esty ("Esty"), Andover's Dean of Students and Residential Life, sent Tommy and his parents a letter which described the

details of the investigative and disciplinary process. [Compl. ¶ 49]; [ECF No. 14-1]. Plaintiffs allege that the letter "nam[ed] crisis counselor Ryan Milligan as the interviewer," [Compl. ¶ 49], though the copy of the letter submitted by Defendants—the authenticity of which is not disputed by Plaintiffs—states that the "formal response process," including interviews, will be conducted by "outside investigators from the law firm of Debevoise & Plimpton," [ECF No. 14-1 at 2]. On May 14, 2024, while Tommy's electronics were still confiscated, the attorneys hired by Andover interviewed Tommy. [Compl. ¶ 50]. Plaintiffs allege that Tommy was not "informed of his rights, the interrogator's identity, or the nature and purpose of the questioning," or of his "ability to pause the interview, or [to] contact his parents" before or during this interview, and that he only learned of those rights when his electronics were returned later. [Id. ¶¶ 50–52]. Tommy was not provided with any disability accommodations during the interview or broader investigation. [Id. ¶ 53].

After the interview, Andover ordered Tommy to leave campus pending the remainder of the investigation and its decision on discipline. [Compl. ¶ 54]. Over the next two weeks, Andover employees "began pressuring Tommy to withdraw from Andover," [id. ¶ 59], including by informing him that "he was likely facing disciplinary action with the possibility of suspension and expulsion," [id. ¶ 60], but that he "could voluntarily withdraw without the incident being recorded on his disciplinary record," [id. ¶ 61]. On May 23, 2024, Andover's Head of School sent a school-wide email that stated, in its entirety, as follows:

> Dear Andover families,
>
> We are taking this opportunity to address a troubling situation involving student conduct that recently came to our attention. While our policy prevents us from discussing the details of any student conduct matter, it is important to reaffirm that our highest priority at Phillips Academy is ensuring the safety and wellbeing of every student.

> Upon receiving a report of concerning behavior the week of May 12, the deans and other campus adults took immediate steps to support our students and gather information.
>
> We learned that the behavior alleged may have involved an unsanctioned student group. Such groups have been banned on campus for decades. About eight years ago, Phillips Academy explicitly restated that ban when a prank signaled their ongoing existence. Dr. Susan Esty, dean of students, issued another reminder of the ban in spring 2023.
>
> *The Blue Book* makes clear that participating in a secret society, unsanctioned club, or other exclusive entity is prohibited at Andover. The reason is simple: These groups often divide communities and promote activities that cause harm to students.
>
> Affirming our commitment to a safe campus community, *The Blue Book* states that we do not tolerate actions that are threatening or pose a risk of harm to the health, safety, or wellbeing of self or others.
>
> If your student is aware of activity regarding so-called secret societies, clubs, or exclusive groups, please ask them to bring that information to a dean. You or your child may also use Ethics Point, which includes options to leave your name or share information anonymously.
>
> As always, thank you for your support and partnership.

[ECF No. 14-7]; [Compl. ¶¶ 60–62].

On May 26, 2024, Tommy withdrew from Andover, "feeling coerced and with no viable alternatives." [Compl. ¶ 63]. When Tommy arrived home, he was "physically and emotionally depleted," and "40 pounds lighter than when he had left for school in January." [Id. ¶ 64]. Plaintiffs allege that Tommy has sought "therapeutic treatment and maintenance with medication" to cope with the emotional distress he has suffered from the events at Andover. [Id. ¶ 117].

After returning home, Tommy applied to two other private boarding schools that had initially expressed interest in him, but those schools unexpectedly denied his applications. [Compl. ¶ 65]. Thereafter, Tommy enrolled in a public school in San Diego. [Id. ¶ 67]. Because Tommy wanted to play lacrosse at his new high school as a transfer student, Esty was

asked to provide certain information to the California Interscholastic Federation ("CIF") about Tommy's transfer. [Id. ¶¶ 67–68]; [ECF No. 14-6]. In response to the question "Is the student transferring with any disciplinary action taken or pending," Esty checked the box labelled "Yes" and wrote in the "Explanation" box below: "Thomas withdrew from Phillips Academy following an investigation but with a school response pending." [ECF No. 14-6 at 4]. After receiving this report, CIF banned Tommy from competing. [Compl. ¶ 68].

### B. Procedural Background

Plaintiffs brought this case on July 28, 2025, [Compl.], and Defendants filed the present motion on September 29, 2025, [ECF No. 12]. Plaintiffs filed an opposition on November 3, 2025, [ECF No. 17], Defendants filed a reply on November 20, 2025, [ECF No. 20], and Plaintiffs filed a sur-reply on December 17, 2025, [ECF No. 24].

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citation modified) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).

The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679).

## III. DISCUSSION

Plaintiffs assert 13 claims against Defendants: breach of contract (Count I); disability discrimination under the Americans with Disabilities Act ("ADA") (Count II); failure to accommodate a disability under the ADA (Count III); defamation (Count $IV_1$); [1] negligence (Count $IV_2$); negligent supervision (Count V); negligent hiring and retention (Count VI); negligent infliction of emotional distress (Count VII); intentional infliction of emotional distress (Count VIII); "deliberate indifference" (Count IX); tortious interference with advantageous relations (Count X); false imprisonment (Count XI); and loss of consortium (Count XII).

Defendants seek dismissal of all claims, [ECF No. 12 at 1], and Plaintiffs oppose with respect to all except their claim for "deliberate indifference" (Count IX), which they withdraw, [ECF No. 17 at 1]. The Court will dismiss Plaintiffs' claim for "deliberate indifference" and address each of the remaining claims in turn.

---

[1] The complaint erroneously contains two counts labelled "Count IV." [Compl. at 11–12]. To avoid confusion, throughout this opinion, the Court will refer to the first Count IV as "Count $IV_1$" and the second as "Count $IV_2$."

### A. Breach of Contract (Count I)

The thrust of Plaintiffs' breach of contract claim is that Defendants breached a contract between Plaintiffs and the school by "improperly removing Tommy" from Andover, including by "fail[ing] to abide by [Andover's] policies" regarding student discipline. [Compl. ¶¶ 73–74].

To succeed on a breach of contract claim under Massachusetts law, Plaintiffs "must demonstrate that 1) a valid contract existed, 2) defendants breached the terms of that contract and 3) plaintiffs sustained damages as a result." Distefano v. Bank of Am., N.A., 822 F. Supp. 3d 168, 173 (D. Mass. 2026) (citing Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007)). "For a breach of contract claim to survive a motion to dismiss, a plaintiff must do more than allege in a conclusory fashion that a defendant breached a contract," but rather must "describe, 'with substantial certainty' the contractual term(s) the defendant purportedly violated." Yaghoobi v. Tufts Med. Ctr., Inc., 762 F. Supp. 3d 85, 98 (D. Mass. 2025) (quoting Brooks, 480 F.3d at 586).

Defendants argue that this claim fails because the Andover handbook, which sets out the school's policies ("The Blue Book"), is not a contract, because Plaintiffs do not identify any other purported contractual obligations, and even if The Blue Book was a contract, Plaintiffs do not identify any provision that was breached. [ECF No. 13 at 10–13]; [ECF No. 20 at 5–6]. Plaintiffs argue that the relationship between a student and private school is inherently contractual under Massachusetts law, and that Tommy's contractual relationship with the school generally entitled him to unbiased and fair treatment. [ECF No. 17 at 5–7].

As an initial matter, it is undisputable that Tommy and Andover had a contractual relationship. "In the private education context, Massachusetts law has long recognized 'a contractual relationship between the school and the student.'" Omori v. Brandeis Univ., 635 F.

Supp. 3d 47, 52 (D. Mass. 2022) (quoting DMP v. Fay School ex rel. Bd. of Trs., 933 F. Supp. 2d 214, 223 (D. Mass. 2013)). In other words, the student-school relationship "is essentially contractual in nature." Durbeck v. Suffolk Univ., 547 F. Supp. 3d 133, 145 (D. Mass. 2021) (quoting Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)).

Although it is easy to find that a contractual relationship exists between a student and a private school, it can be more difficult to determine what the terms of that contract are. The school-student contract's "governing terms" are "often set forth in a combination of handbooks, policy manuals, brochures and promotional material." Omori, 635 F. Supp. 3d at 52 (citing Guckenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997)). In general, courts determine the terms of this contract by looking to these materials and applying "'the standard of reasonable expectation,' that is, 'what meaning the party making the manifestation should reasonably expect the other party to give the terms.'" G. v. Fay Sch., 931 F.3d 1, 12 (1st Cir. 2019) (citation modified) (quoting Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007)). While the "precise expectation" need not be "stated explicitly in the [documents'] language" to become contractually binding, it must be "based on the student's fair interpretation of the [documents'] provisions." Sonoiki v. Harvard Univ., 37 F.4th 691, 709 (1st Cir. 2022). Moreover, like all contracts in Massachusetts, the student-school contract contains an implied covenant of good faith and fair dealing which, in the educational context, imposes an "independent duty to provide basic fairness" in disciplinary matters. Id. at 715.

Plaintiffs point to a number of sources that they claim supply the breached terms of Tommy's contract with the school. Ultimately, the Court does not find any of them persuasive.

First, in their complaint, Plaintiffs invoke Andover's "policies as outlined in the student handbook," [Compl. ¶ 74]. As a general matter, "[t]he relevant terms of the contractual

relationship between a student and a [school] typically include language found in the [school's] student handbook," Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007). That is not the case, however, "where there is an express disclaimer in a student handbook or catalog in which the [school] retains unilateral rights to make changes without notice." Thomas v. Whitcomb, No. 22-cv-10356, 2025 WL 863058, at *10 (D. Mass. Mar. 19, 2025) (citing Finnegan v. Mass. Coll. of Pharmacy & Health Scis. ex rel. Bd. of Trs., No. 23-cv-12997, 2024 WL 4772299, at *7 (D. Mass. Nov. 13, 2024); accord Durbeck, 547 F. Supp. 3d at 146–48; Pacella v. Tufts Univ. Sch. of Dental Med., 66 F. Supp. 2d 234, 241 (D. Mass. 1999). In such a scenario, "any 'offer' in the document [is] illusory," so it cannot supply the terms of a contractual relationship. Durbeck, 547 F. Supp. 3d at 147. Here, as Defendants point out, The Blue Book contains such an express disclaimer, stating that it "is not intended to create, nor does it create, a contract or part of a contract in any way," [ECF No. 14-2 at 9], and that the school "retains the right to deviate from The Blue Book in any given situation," [id. at 25]. Accordingly, the Plaintiffs cannot rely on The Blue Book as creating contractual obligations on the part of Andover.[2]

Second, in attempting to identify a breached contractual promise, Plaintiffs make a broad appeal to the "reasonable expectations" standard. [ECF No. 17 at 6–7]. They argue that

---

[2] Although Plaintiffs argue that they "do not allege that the Blue Book alone constitutes the contract," [ECF No. 17 at 6], the significance of the disclaimer goes beyond merely precluding the Blue Book from serving as a standalone contract. The language, which disclaims the Blue Book's significance either as "a contract or part of a contract," [ECF No. 14-2 at 9] (emphasis added), prohibits Plaintiffs from relying on the Blue Book as a source of terms governing even an independently existing contractual relationship, such as the implied-in-fact contract between a private school and a student. See, e.g., Durbeck, 547 F. Supp. 3d at 146–48 (declining to rely on handbook with contractual disclaimer as source of terms for broader implied-in-fact contract between school and student).

Tommy's reasonable expectations of "due process guarantees," "continued enrollment," and "fair treatment," arising generally from his relationship with the school, constitute binding terms of his contractual relationship. [Id.]. This argument misconstrues the role of the "reasonable expectations" standard, which is a framework for interpreting the boundaries and significance of express promises made by a school, not a freestanding basis for imposing obligations untethered from a school's commitments. See Doe v. Trs. of Bos. Coll., 942 F.3d 527, 533 (1st Cir. 2019) (rejecting reasonable expectations argument where "[n]othing in the contract provides any basis for the expectation"). Other than The Blue Book discussed above, Plaintiffs do not identify any specific promises that they claim gave rise to Tommy's expectations. Plaintiffs therefore have not identified a contractual basis for those expectations. See Barkhordar v. President & Fellows of Harvard Coll., 544 F. Supp. 3d 203, 212 (D. Mass. 2021) (dismissing breach of contract claim where "Plaintiffs have not identified the specific terms that their university should have reasonably expected students to understand" as imposing obligation at issue).

Finally, in their sur-reply brief, Plaintiffs invoke the implied covenant of good faith and fair dealing as the purported source of Andover's breached contractual obligations. [ECF No. 24 at 2–3]. As described above, the covenant of good faith and fair dealing in this context has been characterized as imposing an obligation of "basic fairness" in disciplinary proceedings, which is a highly deferential standard. Sonoiki, 37 F.4th at 715. Here, as an initial matter, Plaintiffs have waived this argument, both by failing to mention the implied covenant of good faith and fair dealing in their complaint, [Compl. ¶¶ 71–75], and by failing to raise it in their initial opposition brief, Murray v. Uber Techs., Inc., 486 F. Supp. 3d 468, 473 (D. Mass. 2020) (citing Noonan v. Wonderland Greyhound Park Realty, LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010)) ("Arguments raised for the first time in a reply brief are generally deemed waived.").

In any event, Plaintiffs have not plausibly alleged the "clear[] abuse[] [of] discretion" necessary to state a claim for a denial of basic fairness. DMP, 933 F. Supp. 2d at 223. Under Massachusetts law, "courts are chary about interfering with academic and disciplinary decisions" made by private schools, Trs. of Bos. Coll., 942 F.3d at 535 (quoting Schaer v. Brandeis U., 735 N.E.2d 373, 381 (Mass. 2000)), and therefore allow schools "broad discretion in determining appropriate sanctions for violations of [their] policies," id. (quoting Coveney v. President & Trs. of Coll. of Holy Cross, 445 N.E.2d 136, 139 (Mass. 1983)). "[A] private [school] need not comply with federal due process to meet the basic fairness requirement in disciplining students." Id. at 533–34 (quoting Schaer, 735 N.E.2d at 381).

In attacking the fairness of the disciplinary proceedings, Plaintiffs first assert that Tommy was misled about the identity of his interviewers in a letter from Esty, [Compl. ¶¶ 49–50], but the undisputedly authentic copy of that letter provided by Defendants plainly and correctly states that Tommy would be interviewed by attorneys hired by the school, [ECF No. 14-1 at 2]. "When [referenced] documents contradict allegations in the complaint, the documents trump the allegations." Dubliner, Inc. v. E. Coast Tavern Grp., Inc., 706 F. Supp. 3d 181, 194 (D. Mass. 2023) (quoting Henning v. Wachovia Mortg., FSB, 969 F. Supp. 2d 135, 147 (D. Mass. 2013)). Plaintiffs also appear to contend that Tommy was entitled to be provided with information about his disciplinary rights before the interview, [Compl. ¶¶ 50–52], but they identify no basis in Massachusetts law for such an entitlement. Trs. of Bos. Coll., 942 F.3d at 534 (rejecting basic fairness challenge where "no state case imposes the requirement [plaintiff] seeks"). Finally, because Tommy withdrew before any disciplinary action had been taken, there is no final

decision to be reviewed. Accordingly, Plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing.[3]

At bottom, Plaintiffs have not "describe[d], 'with substantial certainty,'" any "contractual term(s)" Defendants plausibly violated. Yaghoobi, 762 F. Supp. 3d at 98 (D. Mass. 2025) (quoting Brooks, 480 F.3d at 586). Accordingly, Defendants are entitled to dismissal of Plaintiffs' breach of contract claim.

### B. ADA Claims (Counts II and III)

Plaintiffs' ADA claims center on the allegation that Tommy received "no accommodations for attention or processing needs during the investigation," despite having a recognized accommodation from the school through his IEP. [Compl. ¶¶ 14–16, 53].

To prevail on a failure to accommodate claim under the ADA, a plaintiff must show that (1) "he is disabled within the meaning of the ADA"; (2) "he was otherwise qualified for participation" in the defendant's program; (3) "he made a request for a reasonable accommodation"; and (4) the defendant "denied the request." DMP, 933 F. Supp. 2d at 221.

Defendants argue that Plaintiffs cannot show a failure to accommodate because "Plaintiffs have not alleged that Tommy ever requested any reasonable accommodation from the Academy that was denied." [ECF No. 13 at 13]. Plaintiffs respond that Tommy's IEP was itself an accommodation, and that Defendants' failure to provide "attention or processing" assistance during the investigation constituted a failure to abide by it. [ECF No.17 at 8].

---

[3] To the extent Plaintiffs raise challenges under the covenant of good faith and fair dealing to other actions collateral to the disciplinary process, such as confining Tommy to the Sykes Wellness Center or allegedly coercing his withdrawal, they do so perfunctorily and without explaining how, if at all, the implied covenant of good faith and fair dealing applies to these actions.

Although it appears that Tommy's preexisting IEP was an accommodation protectable under the ADA, Plaintiffs have not alleged that the IEP imposed any obligations related to Tommy's disciplinary proceedings. According to the complaint, Tommy's IEP entitled him to "50% extended time on class-graded assignments and timed writing, access to audiobooks, preferential seating, and note-taking assistance." [Compl. ¶ 16]. None of those entitlements conceivably have any bearing on the school's conduct during a disciplinary proceeding or an investigation into misconduct. Because Tommy's pre-existing accommodation, as alleged, did not apply in this scenario, he was required to make a separate request for any attention or processing assistance he wanted in connection with the investigation. See, e.g., Brown v. Suffolk Univ., No. 19-cv-40062, 2021 WL 2785047, at *5 (D. Mass. Mar. 31, 2021) (dismissing failure to accommodate claim where plaintiff had pre-existing accommodation but "never made a request" for the separate accommodation at issue). The complaint does not indicate that Tommy did so. See generally [Compl.]. Accordingly, Plaintiffs have failed to state a claim for a failure to accommodate under the ADA.[4]

### C. Defamation (Count IV1)

Plaintiffs' defamation claim centers on the May 23, 2024, email sent by Andover to the school community, which they claim contained "false and defamatory statements" about Tommy. [Compl. ¶ 87].

---

[4] Plaintiffs also separately assert a more general claim for "disability discrimination" under the ADA, [Compl. ¶¶ 76–79], but they do not explain how this claim differs from their failure-to-accommodate claim or otherwise attempt to defend it as a standalone basis for liability. To the extent Plaintiffs are advancing a "disparate treatment" theory through this claim, it fails because such a claim requires showing "that the disability actually motivated the defendant's challenged adverse conduct." Nunes v. Mass. Dep't of Correction, 766 F.3d 136, 144 (1st Cir. 2014). Nothing in the complaint plausibly indicates that Tommy's disability, which is unspecified in the complaint, was a motivating force behind any of the school's adverse conduct toward him.

To succeed on a defamation claim under Massachusetts law, a plaintiff must show:

> (1) that the defendant made a statement, concerning the plaintiff, to a third party; (2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss.

Orkin v. Albert, 162 F.4th 1, 13 (1st Cir. 2025) (quoting Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012)). "[T]he question of whether a statement is reasonably susceptible of a defamatory meaning is a threshold question for the court," id. (quoting Shay, 702 F.3d at 81), though "where the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the factfinder," id. (quoting Jones v. Taibbi, 512 N.E.2d 260, 264 (Mass. 1987)) (citation modified).

Defendants argue that Plaintiffs fail to identify any statement in the May 23, 2024, email that is false, or any statement that is "of and concerning" Tommy, given that the email does not refer to any students by name. [ECF No. 13 at 17]. Plaintiffs respond that the conduct described in the email "clearly referred to the incident involving Tommy," and that it "falsely implied that Tommy's conduct posed a risk of harm to the health and safety of others." [ECF No. 17 at 10].

To begin, Plaintiffs have failed to sufficiently identify the alleged defamatory statements at issue. "To properly allege defamation, a plaintiff must specifically identify the allegedly false statement." 3137, LLC v. Town of Harwich, 126 F.4th 1, 15 (1st Cir. 2025) (quoting Kelleher v. Lowell Gen. Hosp., 152 N.E.3d 126, 131 n.2 (Mass. App. Ct. 2020)). Here, Plaintiffs' complaint does not quote the email at issue and does not identify any specific statements they contend asserted or implied false facts. [Compl. ¶¶ 86–90]. Although Plaintiffs' opposition appears to refer, obliquely, to a sentence in which the school stated, "we do not tolerate actions that are threatening or pose a risk of harm to the health, safety, or wellbeing of self or others," [ECF No.

17 at 10]; [ECF No. 14-7], Plaintiffs "cannot amend [their] complaint by adding new allegations or theories in an opposition to a motion to dismiss." D.V.D. v. U.S. Dep't of Homeland Sec., 821 F. Supp. 3d 102, 142 (D. Mass. 2026) (quoting Caldwell v. Cambra, 802 F. Supp. 3d 8, 41 n.10 (D. Mass. 2025)).

Moreover, even if Plaintiffs had properly focused their complaint on this statement, they have not alleged facts to plausibly show that the statement would be understood by readers to be "of and concerning" Tommy where, as Plaintiffs admit, the email did not mention Tommy. [Compl. ¶ 62]; [ECF No. 14-7]. Although a statement need not refer to a plaintiff by name to defame him, "[i]f the person is not referred to by name . . . extrinsic facts must be alleged and proved showing that a third person other than the person [defamed] understood it to refer to him." Yong Li v. Yanling Zeng, 159 N.E.3d 199, 204 (Mass. App. Ct. 2020) (quoting Brauer v. Globe Newspaper Co., 217 N.E.2d 736, 739 (Mass. 1966)). Plaintiffs provide virtually no factual allegations to support their conclusion that "the larger community understood that the email was about [Tommy]," [Compl. ¶ 62], or even knew that Tommy had been implicated in the investigation, particularly in light of their allegation that "several other students" were also involved in the same investigation, [Compl. ¶ 42].

Finally, Plaintiffs fail to offer any facts to support the school's culpability for making this statement. Where, as here, the allegedly defamed party is a private individual, he "needs to demonstrate that the [speaker] was negligent" in making the statement at issue. Landino v. Mass. Tchrs. Ass'n, 621 F. Supp. 3d 185, 193 (D. Mass. 2022) (citing Hi-Tech Pharms., Inc. v. Cohen, 277 F. Supp. 3d 236, 248 (D. Mass. 2016)). To do so, he "must demonstrate that the defendant failed 'to act reasonably in checking on the truth or falsity of the challenged communication before publishing it, keeping in mind customs and practices within the

defendant's profession.'" Id. (quoting Hi-Tech Pharms., 277 F. Supp. 3d at 248–49) (citation modified). Beyond the bare legal conclusion that "Defendants were negligent in their publication and failed to exercise reasonable care to determine the veracity of their statements," [Compl. ¶ 89], the complaint is devoid of allegations supporting an inference that Andover failed to act reasonably to verify the truth of the statements in the May 23, 2024, email. Accordingly, Plaintiffs have failed to state a claim for defamation.

### D. Negligence and Negligent Infliction of Emotional Distress (Counts $IV_2$ and VII)

Plaintiffs' negligence (Count $IV_2$) and negligent infliction of emotional distress (Count VII) claims focus on Defendants' purported negligence in relation to two distinct harms allegedly experienced by Tommy: (1) Tommy's experience of hazing at the hands of TUBs members in 2023, and (2) Tommy's negative experiences at the hands of school administrators during the investigation and related disciplinary proceedings in 2024.

To succeed on a claim for negligence under Massachusetts law, a plaintiff must "prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." Suquilanda v. Skyway Roofing, Inc., 283 N.E.3d 798, 802–03 (Mass. 2026) (quoting Jupin v. Kask, 849 N.E.2d 829, 834–35 (Mass. 2006)). An ordinary negligence claim requires proof that the plaintiff experienced "physical harm or property damage" of some type. Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 46 (Mass. 2009) (citing Aldrich v. ADD Inc., 770 N.E.2d 447, 454 (Mass. 2002)).

Claims for negligent infliction of emotional distress under Massachusetts law are similar to ordinary negligence claims but allow recovery for negligence without a showing of physical injury or property damage if the plaintiff can demonstrate, in addition to the normal negligence

elements, (1) "emotional distress," (2) "physical harm manifested by objective symptomatology," and (3) "that a reasonable person would have suffered emotional distress under the circumstances of the case." J.S.H. v. Newton, 164 F.4th 142, 149 (1st Cir. 2026) (quoting Lanier v. President & Fellows of Harvard Coll., 191 N.E.3d 1063, 1072 (Mass. 2022)).

Because the two harms underlying Plaintiffs' negligence claims—Tommy's experience of hazing and his negative disciplinary experience—implicate distinct duties and distinct forms of alleged negligence, the Court will address them separately.

1. Negligence Relating to Hazing

Plaintiffs contend that Defendants' negligence in supervising and regulating student group activity resulted in the 2023 hazing incident in which Tommy was allegedly coerced and intimidated, blindfolded, forced into the trunk of a car, repeatedly struck, pushed to the ground, waterboarded, and urinated upon. [Compl. ¶¶ 22–31].

Defendants' primary argument against this theory of negligence is that they owed no duty to take reasonable steps to prevent hazing because the risk of hazing to Tommy by a banned "secret society" was not reasonably foreseeable. [ECF No. 13 at 19]. Plaintiffs respond that courts have long recognized a special duty private schools owe to residential students, and that Andover's prior knowledge of secret societies made the possibility of harmful hazing reasonably foreseeable. [ECF No. 17 at 10–11].

The Court agrees with Plaintiffs that, as a matter of Massachusetts law, a private school owes a duty of reasonable care to protect residential students from hazing that causes harm. "Whether a duty exists is a question of law informed by foreseeability, the relationship of the parties, existing social values, and public policy." Suquilanda, 283 N.E.3d at 806. Massachusetts law has long recognized that schools have a "special relationship with their

students," which imposes an expectation that "reasonable care will be exercised to protect resident students from foreseeable harm," including from "the criminal acts of third parties." Helfman v. Ne. Univ., 149 N.E.3d 758, 768 (Mass. 2020) (citing Mullins v. Pine Manor Coll., 449 N.E.2d 331, 337 (Mass. 1983)). This duty is especially pertinent "in the case of residential students at the elementary, middle, and secondary levels." McLeod v. Fessenden Sch., 624 F. Supp. 3d 45, 50 (D. Mass. 2022) (citing Bash v. Clark Univ., No. 06745A, 2006 WL 4114297, at *4 (Mass. Super. Ct. Nov. 20, 2006)).

Although the Supreme Judicial Court has not addressed the specific circumstance of hazing by student groups, it falls closely in line with other circumstances involving third party acts in which the Supreme Judicial Court has found that schools owe a duty of care. In Brown v. Knight, 285 N.E.2d 790 (Mass. 1972), the court upheld a jury verdict of negligence against a summer school, finding that the potential for injury-causing "horseplay" among young students was "conduct foreseeable by the defendant" and therefore fell within the school's "duty to protect [students] from the foreseeable conduct of third persons." Id. at 792. Later, in Mullins, the court found that colleges owe a duty of reasonable care to provide adequate security on their campuses to protect students from assaults by third parties, regardless of whether there had been "prior criminal acts on the campus." 449 N.E.2d at 336–37.[5]

In light of these previous pronouncements, this Court finds that hazing by student groups is the type of "foreseeable conduct of third persons" the Supreme Judicial Court is likely to recognize as creating a duty of reasonable care for schools. Brown, 285 N.E.2d at 792. Like the

[5] The Court further notes that in Soares v. Lakeville Baseball Camp, Inc., 343 N.E.2d 840 (Mass. 1976), the Supreme Judicial Court "assum[ed]," without deciding, that summer camp supervisors "exercising due care" have an obligation to prevent "excessive" hazing among minors. Id. at 841.

"horseplay" in Brown and the assault in Mullins, hazing is a well-known and foreseeable source of potential harm for students on school campuses. Indeed, it is so well-known and foreseeable that the Massachusetts legislature has specifically proscribed it by statute. See Mass. Gen. Laws ch. 269, § 17. That hazing occurs when groups of students are left unsupervised should therefore come as no surprise to a school. Recognizing this fact, numerous other state supreme courts have imposed a duty of care on schools that requires them to take reasonable steps to prevent hazing. See, e.g., Martinez v. Wash. State Univ., 593 P.3d 762, 772–76 (Wash. 2026); Furek v. Univ. of Del., 594 A.2d 506, 520 (Del. 1991); Knoll v. Bd. of Regents of Univ. of Neb., 601 N.W.2d 757, 764 (Neb. 1999). Making an "informed prophecy," as it must, Aubee v. Selene Fin. LP, 56 F.4th 1, 4 (1st Cir. 2022), this Court predicts that the Supreme Judicial Court would rule similarly.

As for Defendants' argument that the specific risk of harm to Tommy from TUBs was not foreseeable to Andover, the Court is not persuaded. "Reasonable foreseeability under tort law does not require the precise sequence of events or manner of injury [be] foreseeable." Jupin, 849 N.E.2d at 837 n.8 (quoting Andrew J. McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1232 (2000)). As discussed above, it is generally foreseeable that hazing will often occur among high school and college students if a school does not take reasonable steps to curb the behavior. It is therefore "irrelevant whether [Andover] foresaw or should have foreseen the specific danger that occurred." Id. Accordingly, the Court finds that Andover owed a duty of care to take reasonable steps to protect its students from hazing.

The question remains, however, whether the allegations in the complaint plausibly establish a breach of this duty. Although the allegations on this point are far from robust, the

Court finds that they are sufficient to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Plaintiffs allege that "[s]ecret societies" like TUBs are "widely known" to exist on Andover's campus, [Compl. ¶ 19], and Andover's own statement to "Andover families" (which the Court may consider alongside the complaint), indicates that it knew these groups have a tendency to engage in conduct that "cause[s] harm to students," [ECF No. 14-7]. The complaint further alleges that these secret societies, despite being formally banned, and despite their tendency to engage in harmful conduct like hazing, have "long operated with tacit institutional tolerance." [Compl. at 1]. Finally, it alleges that in the months leading up to Tommy's hazing incident, TUBs "publicly re-emerged on campus," [id.], yet Andover "fail[ed] to investigate or otherwise prevent violations" of school policy by them, [id. ¶ 112]. Indeed, based on Andover's statement, it does not appear that any meaningful disciplinary action (beyond a "reminder of the ban") occurred until over a year after TUBs is alleged to have "publicly re-emerged on campus." [ECF No. 14-7]. Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that these allegations are enough to render a breach of duty plausible.

The Court further finds that Plaintiffs have plausibly alleged harm sufficient to sustain both their negligence (Count $IV_2$) and negligent infliction of emotional distress (Count VII) claims. The physical assault Tommy alleges he experienced at the hands of TUBs members is plainly the type of "physical harm or property damage" that can support an ordinary negligence claim. Cumis Ins. Soc'y, 918 N.E.2d at 46 (citing Aldrich, 770 N.E.2d at 454). And Plaintiffs plausibly allege that this incident—which is alleged to have involved various forms of torment and humiliation—caused Tommy the type of objectively reasonable "emotional distress" and "objective symptomology" necessary to state a claim for negligent infliction of emotional

distress, J.S.H., 164 F.4th at 149, as they allege the incident led Tommy to "seek[] therapeutic treatment and maintenance with medication." [Compl. ¶ 117]; see Lanier, 191 N.E.3d at 1072 (noting that "physical harm is interpreted to include a broad range of symptoms," including those that "could be classified as more 'mental' than 'physical'" (quoting Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 566 (Mass. 2002))). The Court will therefore decline to dismiss the negligence (Count $IV_2$) and negligent infliction of emotional distress (Count VII) claims against Andover insofar as they are based upon Tommy's harm from hazing.[6]

2. Negligence Relating to Disciplinary Process

The second, independent basis for Plaintiffs' negligence claim is that Defendants acted negligently during Tommy's investigation and disciplinary process by "failing to act in a reasonable manner to protect Tommy and his interests." [Compl. ¶ 97]. Defendants argue that this theory of negligence fails because private schools, as a matter of law, owe no tort-based duty of care to students with regard to their disciplinary processes. [ECF No. 13 at 20].

Defendants are correct. The First Circuit has explained that where a school's "disciplinary proceedings arose from [a] contractual relationship," the school "d[oes] not owe . . . any additional independent duty outside of their existing contractual relationship" with regard to those proceedings, and any remedy "must sound in contract, not in tort." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 94 (1st Cir. 2018); see also Doe v. Harvard Univ., 462 F. Supp. 3d 51, 67 (D. Mass. 2020) (citing Trs. of Bos. Coll., 892 F.3d at 93–94) ("[A]s a matter of law, the duty of care

[6] With regard to these claims as asserted against Esty, however, Plaintiffs have not alleged any acts or omissions by Esty, specifically, that breached a duty that she may have owed in her individual capacity relating to hazing. Nor have they explained how any acts or omissions by Esty are causally related to the hazing Tommy experienced, as required to satisfy the causation element of negligence. The Court will therefore dismiss these claims against Esty.

between a student and his university is one created by contract.”). As the Court has explained, Tommy’s relationship with Andover was “essentially contractual in nature.” Durbeck, 547 F. Supp. 3d at 145 (quoting Mangla, 135 F.3d at 83). Because Andover owed Tommy no tort-based duties with regard to his disciplinary process, he may not assert a negligence claim based on alleged lapses in that process.

**E. Negligent Supervision, Hiring, and Retention (Counts V and VI)**

Plaintiffs’ claims for negligent supervision (Count V) and negligent hiring and retention (Count VI) are each based on the same two incidents as their other negligence claims: Tommy’s 2023 hazing incident and the 2024 investigation and disciplinary process, but focus specifically on the school’s alleged negligence in supervising, hiring, and retaining staff.

Claims for negligent supervision and negligent hiring are simply negligence claims involving a specific kind of breach: one of the “duty to exercise reasonable care in the selection and retention of . . . employees.” Doe v. Bradshaw, 203 F. Supp. 3d 168, 187 (D. Mass. 2016) (quoting Foster v. Loft, Inc., 526 N.E.2d 1309, 1310 (Mass. App. Ct. 1988)). To show such a breach, “[a] plaintiff must ‘allege that [the employer] knew, or should have known, that the offending employee had a proclivity to commit the complained-of acts, and that the employer nevertheless failed to take corrective action.’” Czerwienski v. Harvard Univ., 666 F. Supp. 3d 49, 99 (D. Mass. 2023) (alteration in original) (quoting Bloomer v. Becker Coll., No. 09-cv-11342, 2010 WL 3221969, at *9 (D. Mass. Aug. 13, 2010)).

With regard to Tommy’s 2023 hazing, the complaint does not offer any facts to suggest that any breach by Andover arose from its employee hiring, retention, or supervision practices. The only employee mentioned in either Plaintiffs’ negligent supervision or negligent hiring and retention claims is Esty, [Compl. ¶¶ 99–113], but, as described above, the complaint does not

explain how Esty is responsible for the hazing Tommy experienced. Nor does it contain factual allegations indicating that Andover "knew, or should have known, that [Esty] had a proclivity to commit [any] complained-of acts," or that it "nevertheless failed to take corrective action." Czerwienski, 666 F. Supp. 3d at 99 (quoting Bloomer, 2010 WL 3221969, at *9). Plaintiffs' negligent supervision, hiring, and retention claims therefore fail to the extent they are premised upon Tommy's 2023 hazing incident.[7]

Those claims also fail insofar as they relate to the 2024 investigation and disciplinary process. As an initial matter, the contractual nature of the disciplinary process may bar those claims for the same reasons that it bars Plaintiffs' ordinary negligence and negligent infliction of emotional distress claims, as discussed in the preceding section.[8] Even assuming that such claims are theoretically viable, however, the complaint is devoid of facts to suggest that Esty "had a proclivity to commit [any] complained-of acts," or that Andover "knew, or should have known" of such a proclivity. Czerwienski, 666 F. Supp. 3d at 99 (quoting Bloomer, 2010 WL 3221969, at *9). Accordingly, the Court will dismiss Plaintiffs' claims for negligent supervision (Count V) and negligent hiring and retention (Count VI).

---

[7] Plaintiffs' claim for negligent supervision (Count V) also appears to be based upon a contention that Andover's failure to supervise students led to Tommy's hazing incident. [Compl. ¶ 104]. To the extent this claim focuses on supervision of students, it is wholly duplicative of Plaintiffs' ordinary negligence claim (Count $IV_2$), so the Court will dismiss it. See Doe v. Stonehill Coll., 55 F.4th 302, 338 (1st Cir. 2022) (citing Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013)) (affirming dismissal of wholly duplicative claim).

[8] It appears to be unsettled whether the "limitation for tort claims premised on contractually based disciplinary procedures" applies to negligent supervision, hiring, or retention claims. See Stonehill Coll., 55 F.4th at 338 (declining to decide the issue).

### F. Intentional Infliction of Emotional Distress (Count VIII)

Plaintiffs' claim for intentional infliction of emotional distress is based primarily upon Tommy's 18-hour confinement during the 2024 investigation.

To succeed on a claim for intentional infliction of emotional distress ("IIED") under Massachusetts law, a plaintiff must prove that (1) the defendant "intended to cause, or should have known that [its] conduct would cause, emotional distress," (2) the defendant's "conduct was 'extreme and outrageous,'" (3) the conduct "caused [the plaintiff's] distress," and (4) the plaintiff "suffered 'severe distress.'" J.S.H., 164 F.4th at 151 (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)). The "extreme and outrageous" element requires that the conduct at issue be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Roman, 964 N.E.2d at 341). Accordingly, "the standard for making an IIED claim is very high." Id. (citation modified) (quoting Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014)).

The parties' chief dispute concerns the "extreme and outrageous" element. Defendants argue that the conduct alleged—confining Tommy to a room pending a disciplinary investigation—does not plausibly cross the line of "utterly intolerable in society." [ECF No. 13 at 24–25]. Plaintiffs respond that the conduct alleged "goes far beyond any reasonable exercise of school disciplinary authority," and that their allegations meet the low pleading threshold for stating a plausible claim of IIED. [ECF No. 17 at 14].

Accepting Plaintiffs' allegations as true and construing all reasonable inferences in their favor, the Court finds that Plaintiffs have stated a plausible claim for IIED at the pleading stage. Under the Second Restatement of Torts, "[t]he extreme and outrageous character of the conduct

may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46 cmt. E.[9] Discussing this principle, the First Circuit has found that it "naturally applies to the university-student relationship," as a "student stands in a particularly vulnerable relationship vis-a-vis the university, the administration, and the faculty." Doe v. Brown Univ., 43 F.4th 195, 210 (1st Cir. 2022) (quoting Russell v. Salve Regina Coll., 649 F. Supp. 391, 402 (D.R.I. 1986)). Thus, "a university can 'fairly be expected' to act 'maturely—and even with some tenderness and solicitude—toward' its students." Id. (quoting Russell, 649 F. Supp. at 402). This principle applies even more strongly to the relationship between a secondary boarding school and its minor students, who are especially dependent on the school to meet their emotional and physical needs. Cf. Bash, 2006 WL 4114297, at *4 (recognizing "fundamental and obvious distinctions" in duty owed secondary school and college students).

Here, Tommy and Andover had just such a relationship. Considering the power dynamic at play, and Tommy's vulnerability as a minor thousands of miles from his parents, some of the conduct Plaintiffs allege can reasonably be viewed as sufficiently lacking in "tenderness and solicitude" to plausibly underlie a claim for the intentional infliction of emotional distress. Brown Univ., 43 F.4th at 210. Specifically, Plaintiffs allege that Defendants, before any disciplinary investigation had been carried out or any findings made, confined Tommy to an unfamiliar room, against his will, for "at least 18 hours." [Compl. ¶¶ 40–42, 139]. They allege that Defendants kept Tommy largely isolated during this time, [id. ¶ 43], without any of his

---

[9] The Supreme Judicial Court has repeatedly adopted this section of the Restatement. See, e.g., Agis v. Howard Johnson Co., 355 N.E.2d 315, 318–19 (Mass. 1976); Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987).

possessions, [id. ¶¶ 41, 43–44], without any means for his parents to contact him, [id. ¶¶ 45–46, 139], and largely without food, [id. ¶¶ 43, 139]. Despite the confinement occurring during finals week, Plaintiffs allege that Defendants prevented Tommy from accessing any of his course materials. [Id. ¶ 44]. Although the question of whether this alleged conduct was "extreme and outrageous" is ultimately one for the factfinder, Plaintiffs' allegations are sufficient at the pleading stage to raise the possibility of such conduct "above the speculative level." Twombly, 550 U.S. at 555.

Regarding Defendants' argument that Plaintiffs have failed to plausibly allege severe emotional distress, the Court disagrees. As Plaintiffs point out, they allege that Tommy lost significant weight and was "physically and emotionally depleted" as a result of the distress caused by this and other related incidents, [Compl. ¶ 64], and that those events have resulted in Tommy "seeking therapeutic treatment and maintenance with medication," [id. ¶ 117]. That is sufficient at the pleading stage. The Court will therefore decline to dismiss Plaintiffs' claim for the intentional infliction of emotional distress (Count VIII).

### G. Tortious Interference (Count X)

Plaintiffs base their tortious interference claim against Esty upon two alleged instances of interference with prospective relationships that Tommy pursued after his withdrawal from Andover. First, they allege that Esty interfered with Tommy's applications to other boarding schools, resulting in those schools denying him admission. [Compl. ¶¶ 130–133]. Second, they allege that Esty interfered with Tommy's attempt to play lacrosse with the CIF by providing inaccurate information about Tommy's transfer. [Id. ¶¶ 134–137].

To succeed on a claim for tortious interference with advantageous relations under Massachusetts law, a plaintiff must show that:

> (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or [business] relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019) (alteration in original) (quoting Blackstone v. Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)).[10]

1. Interference with Other Boarding Schools

Plaintiffs do not offer sufficient factual content to support their claim with regard to Esty's alleged interference with Tommy's applications to other boarding schools. The only factual allegation Plaintiffs offer on this issue is that two boarding schools "unexpectedly declined to move forward with [Tommy's] applications, despite previously expressing sincere interest in him." [Compl. ¶ 65]. From that lone fact, Plaintiffs conclude, "upon information and belief," that "Dean Esty interfered with [Tommy's] applications by providing damaging or misleading information in violation of her promise that no discipline would be maintained in his records." [Id. ¶ 66].

The fact that two schools unexpectedly rejected Tommy's application, standing alone, does not plausibly lead to the conclusion that Esty is responsible for that outcome, much less that she engaged in improper conduct to intentionally cause it. And Plaintiffs' latter assertion that

[10] Plaintiffs label their tortious interference claim as one for "Tortious Interference with Contractual Relations," though they do not allege any existing contractual relationship. Despite the labelling of this claim, the Court notes that "Massachusetts courts 'have not consistently distinguished between'" claims for interference with contracts and interference with other types of relationships. Hamann, 937 F.3d at 92–93 (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 n.6 (Mass. 1990). The Court therefore construes Plaintiffs' tortious interference claim as one for "tortious interference with advantageous relations" under Massachusetts law, which allows recovery for interference with prospective relationships like the ones Plaintiffs allege here.

Esty "interfered with [Tommy's] applications by providing damaging or misleading information" is conclusory and cannot be presumed true absent additional factual enhancement. See Lavigne v. Great Salt Bay Cmty. Sch. Bd., 146 F.4th 115, 123 (1st Cir. 2025) ("'[A]ssertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint' are insufficient to state a cognizable claim." (quoting Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012))), cert. denied, 146 S. Ct. 1852 (2026). Plaintiffs have therefore failed to state a claim for tortious interference with Tommy's prospective relationships with other boarding schools.

2. Interference with CIF

Plaintiffs have also not plausibly alleged that any interference by Esty with Tommy's relationship with CIF was "improper in motive or means." Hamann, 937 F.3d at 93. They assert that Esty interfered with this relationship by inaccurately checking a box labelled "Yes" on a CIF form that asked whether Tommy was "transferring with any disciplinary action taken or pending," [ECF No. 14-6 at 4]; see [Compl. ¶¶ 68, 136], but they do not allege any other facts—apart from the purported inaccuracy of that representation itself—concerning Esty's motive or means. Accordingly, Plaintiffs' claim as to CIF turns on whether they have alleged a misrepresentation that would satisfy the wrongful-conduct element. Although a plaintiff may, in general, satisfy the wrongful conduct element of a tortious interference claim by showing that the defendant "'misrepresented any facts [or] defamed anyone' in the course of the interference," Sheldon v. F.W. Webb Co., 801 F. Supp. 3d 59, 70 (D. Mass. 2025) (quoting Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016)), Plaintiffs here have not plausibly alleged any actual misrepresentation by Esty.

When Esty checked the "Yes" box in the CIF form, she wrote in the "Explanation" field immediately below it: "Thomas withdrew from Phillips Academy following an investigation but with a school response pending." [ECF No. 14-6 at 4]. Based on the facts Plaintiffs allege, that statement was entirely accurate. See [Compl. ¶¶ 59, 63]. To the extent Esty's "Yes" answer bore any misleading implications about the existence of final disciplinary action against Tommy (which itself is not apparent to the Court), Esty's simultaneous clarifying statement negated them, as it made clear that no final determination had been made. Thus, Esty's answer on the form, viewed holistically, cannot reasonably be construed as asserting any false or defamatory facts. Cf. Cass v. Town of Wayland, 383 F. Supp. 3d 66, 87 (D. Mass. 2019) ("When determining whether a statement is defamatory, 'the court must analyze the statement in light of the totality of the circumstances, including the entire context of the publication.'" (quoting Shay, 702 F.3d at 81)). Because Plaintiffs have failed to plausibly allege that any representation Esty made was inaccurate—and thus failed to allege that she engaged in interference with Tommy's relationship with CIF that was "improper in motive or means," Hamann, 937 F.3d at 93—they have failed to state a claim for tortious interference.

**H. False Imprisonment (Count XI)**

Plaintiffs' claim for false imprisonment is based on Defendants' confinement of Tommy to the Sykes Wellness Center during his disciplinary investigation.

The elements of false imprisonment under Massachusetts law are "(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." Cabot v. Lewis, 241 F. Supp. 3d 239, 258 (D. Mass. 2017) (quoting Sietins v. Joseph, 238 F. Supp. 2d 366, 381 (D. Mass. 2003)).

The parties do not appear to dispute that Defendants intended to confine Tommy to the Sykes Wellness Center, that he was conscious of the confinement, or that he did not consent to the confinement. See [ECF No. 17 at 17]; [ECF No. 13 at 31]. Instead, Defendants argue that Plaintiffs' false imprisonment claim must be dismissed because, as a boarding school responsible for Tommy's care, Andover operated "in loco parentis" and thus was permitted to confine Tommy. [ECF No. 13 at 31]. They analogize to a parent's or boarding school's authority to set a nightly curfew, or to forbid off-campus travel without permission. [Id.]. Plaintiffs respond that "[t]here is a clear difference between schoolwide policies that dictate when and where students are allowed to go, and a targeted punishment against a student that requires their extended detainment." [ECF No. 17 at 17–18].

As an initial matter, the parties seem to agree that Andover "stand[s] in loco parentis over the children entrusted to [it]," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995), meaning that it exercises "such a portion of the power of the parent committed to [its] charge," id. at 655 (quoting 1 W. Blackstone, Commentaries on the Laws of England 441 (1769)). The question becomes, then, whether a parent would be permitted to engage in the challenged conduct. Neither party, however, directs the Court to clear authority addressing the boundaries of a parent's common law privilege to confine minors under his or her care. Based on the Court's own review of Massachusetts authority, it appears that the Supreme Judicial Court has not squarely addressed this question.

Although the Court may eventually need to predict the precise standard the Supreme Judicial Court would apply, it need not do so at this early stage. For now, Defendants have failed to carry their burden to justify the application of a common law parental privilege defense to their conduct, as they have done no more than invoke the broad principle of in loco parentis

without adequately explaining the contours of the defense or supporting its application to the facts alleged. See Nuon v. City of Lowell, 768 F. Supp. 2d 323, 336 (D. Mass. 2011) (citing McDermott v. W.T. Grant, 49 N.E.2d 115, 116 (Mass. 1943)) ("In an action for false arrest, the defendant bears the burden of proving justification for any arrest for which [it] is responsible."). Accordingly, for present purposes, the Court finds that Plaintiffs have stated a claim for false imprisonment.

### I. Loss of Consortium (Count XII)

Plaintiffs' final claim, for loss of consortium, is based on the alleged injuries Tommy's parents, Brian and Meghan McCool, have suffered as a result of their son's experiences.

Massachusetts's loss of consortium statute allows "[t]he parents of a minor child" to bring a "cause of action for loss of consortium of [a] child who has been seriously injured against any person who is legally responsible for causing such injury." Mass. Gen. Laws, ch. 231, § 85X. "Consortium claims are derivative in nature, so [they] require[] an underlying tortious act." Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 315 (D. Mass. 2017) (citing Mouradian v. Gen. Elec. Co., 503 N.E.2d 1318, 1321 (Mass. App. Ct. 1987)).

As another session of this Court recently noted, "[c]onsortium is defined as benefits a person receives from another, including companionship, cooperation and affection." Bezanson v. Dobbs, 821 F. Supp. 3d 168, 176 (D. Mass. 2026) (citing Consortium, Black's Law Dictionary (12th ed. 2024)). Massachusetts courts have further recognized that parents may recover for loss of consortium where "sever[e] and permanen[t]" injuries render a child "physically, emotionally, and financially dependent on them" in a way that "significantly restructure[s]" their lives. Reckis v. Johnson & Johnson, 28 N.E.3d 445, 469 (Mass. 2015) (quoting Monahan v. Methuen, 558 N.E.2d 951, 956 (Mass. 1990)). Thus, the two types of parental injuries cognizable under

the loss of consortium statute occur where an injury to a child (1) deprives the parent of the child's companionship, or (2) renders the child wholly dependent him or her. Absent one of these scenarios, a parent's experience of "fear, anxiety and emotional distress" on behalf of his or her child, or as a collateral result of injuries to the child, is not the type of injury "contemplated within the meaning of loss of consortium." Bezanson, 821 F. Supp. 3d at 176.

Here, the parental injuries Plaintiffs have alleged are not the type of injuries cognizable under the loss of consortium statute. Plaintiffs allege that as a result of Tommy's experiences at Andover, Brian and Meghan McCool have experienced "significant turmoil and fear . . . that their son would not physically and emotionally recover, his future playing lacrosse at Tufts would be taken away, and that he and their family would forever be impacted by Dean Esty's actions." [Compl. ¶ 148]. This is the type of "fear, anxiety and emotional distress" on behalf of another that the court found to be non-cognizable in Bezanson, 821 F. Supp. 3d at 176. Plaintiffs do not offer any factual allegations to support a conclusion that Brian and Meghan McCool have been deprived of Tommy's "companionship, cooperation and affection," id., or that Tommy's injuries have rendered him "physically, emotionally, and financially dependent on them," Reckis, 28 N.E.3d at 469. Although Plaintiffs assert in passing that Brian and Meghan McCool "were deprived of their son's society and companionship," [Compl. ¶ 147], they offer no facts in support of that bare legal conclusion.

Moreover, even if Plaintiffs plausibly alleged the right types of injuries, they do not connect those injuries to any plausibly tortious conduct by Esty, the sole Defendant against whom Plaintiffs bring their loss of consortium claim. The only alleged "underlying tortious act," Thomas, 267 F. Supp. 3d at 315, for which the Court has found Esty's liability plausible is Tommy's confinement during his investigation. Plaintiffs do not allege that any of Brian and

Meghan McCool's derivative injuries arose from Tommy's confinement-related injuries. See [Compl. ¶¶ 147–149]. Accordingly, the Court will dismiss Plaintiffs' claim for loss of consortium.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, [ECF No. 12], is **GRANTED IN PART** and **DENIED IN PART**, as follows: Plaintiffs' claims for breach of contract (Count I), disability discrimination (Count II), failure to accommodate (Count III), defamation (Count $IV_1$), negligent supervision (Count V), negligent hiring and retention (Count VI), deliberate indifference (Count IX), tortious interference (Count X), and loss of consortium (Count XII), are **DISMISSED** in their entirety against all Defendants; Plaintiffs' claims for negligence (Count $IV_2$) and negligent infliction of emotional distress (Count VII) are **DISMISSED** against Esty in their entirety, and against Andover to the extent they are based upon the 2024 investigation and disciplinary proceedings; Defendants' motion is denied as to the remaining claims as asserted by Tommy.[11]

The dismissal of the above claims is without prejudice and with leave to file an amended complaint within fourteen days of this order. The Court encourages Plaintiffs to be thoughtful about which claims, if any, they choose to replead, and to replead only claims for which they can cure the deficiencies identified in this Order.

For clarity, the surviving claims are as follows: Tommy's claims for negligence (Count $IV_2$) and negligent infliction of emotional distress (Count VII), as asserted against Andover, to

[11] Although Plaintiffs are not clear about which Plaintiffs assert which claims, to the extent Plaintiffs Brian and Meghan McCool purport to bring any surviving claims on behalf of themselves, their claims are **DISMISSED**, as none of the surviving claims involve injuries to any Plaintiff other than Tommy.

the extent those claims are based upon Tommy's 2023 hazing incident; Tommy's claim for intentional infliction of emotional distress (Count VIII); and Tommy's claim for false imprisonment (Count XI).

**SO ORDERED.**

September 29, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE